UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ATLANTIC SPECIALTY INSURANCE et al.,          :

                Plaintiff,          :          <u>OPINION AND ORDER</u>

   -v.-          :
                              07 Civ. 8508 (LAP) (GWG)

AE OUTFITTERS RETAIL COMPANY,          :

              Defendant.          :
-----------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiffs in this action, subrogees of tenants and occupants of a six-story building at 575 Broadway ("the building"), have brought claims for property damage sustained as a result of a fire in the building in January 2006 against the tenant of the building, American Eagle Outfitters, Inc. ("AE"). AE has brought third-party actions based on negligence and breach of contract against the building's owners, 575 Broadway, LLC, 575 Broadway Associates L.P., and 575 Broadway Corporation (collectively, "575 Broadway"), and against the company that maintained the fire alarm system, Integrated Systems and Power Inc. ("ISPI"). We will refer to ISPI and 575 Broadway collectively as the "defendants." The defendants have joined together to bring the instant motion pursuant to Federal Rules of Civil Procedure 702, 402, and 403 to preclude an inspection and testing of the building's fire alarm system that was conducted by AE's proposed expert witness, Jeffrey Zwirn, in September 2011. They also seek to preclude Zwirn's testimony and expert report. For the following reasons, defendants' motion to preclude Zwirn's testimony and expert report is granted.

I.    <u>BACKGROUND</u>

On January 21, 2006, a fire occurred in a six-story building located at 575 Broadway.

See Complaint, filed Oct. 2, 2007 (Docket # 1) ("First Compl."), ¶¶ 18, 24–26; Affidavit in

Support, filed Nov. 15, 2012 (Docket # 254) ("Mezzacappa Aff."), ¶ 3.  The parties dispute the

cause of the fire and the course of events that took place before, during, and after the fire.  We

discuss the disputed facts solely to give some context to the issue of the admissibility of the

opinions being offered by Zwirn.

      A.      AE's Version of Events and Zwirn's Proposed Testimony

Replying on deposition testimony in the case and other record evidence, Zwirn's expert

report asserts that the fire originated in "[w]ood joists above solid sheet rock ceiling above the

southwest corner of the 1st floor duct room" of the building.  See Letter from Jeffrey D. Zwirn to

Steven D. Phillips, Esquire, dated Jan. 31, 2012 (annexed as Ex. U to Mezzacappa Aff.) ("Zwirn

Report" or "Report"), at 5.  The Report cites the testimony of Fire Marshal Ott that the cause of

the fire was of "'unknown origin' . . . most likely caused by electrical faults in the cables."  Id.

While combustible materials stored in the duct room (also referred to as the "marketing room")

by American Eagle "contributed to the flame and smoke found in and emitting from the first floor

duct room," that part of the fire was "extinguished as early as five minutes after FDNY arrived at

the scene at 10:07 p.m."  Id.   The Fire Marshal concluded "that the fire discovered by American

Eagle employees in the [duct room] was a 'drop down fire' resulting from the ceiling joists

burning down through the sheet rock ceiling and dropping embers to the floor below."  Id.

Zwirn asserts that the "initial alarm of fire was generated by the triggering of a smoke

detector in the second floor . . . space," meaning that "the fire was already well up into the

building when AE employees first noticed the drop down fire."  Id. at 6.  The Report states that

the building's Fire Safety Director, Gani Haxhaj, was not properly certified and, as described

further below, opines that he used a "central station activation switch" to stop the alarm system's

signal from being transmitted to the fire department.  Id. at 7; id. at 10, 13, 15, 26–27;
Affirmation in Opposition Motions [sic] of ISPI and 575 Broadway to Preclude/Exclude Alarm
Expert Jeffrey Zwirn, filed Feb. 4, 2013 (Docket ## 277–280) ("Phillips Aff."), ¶¶ 11, 17.

Zwirn's report describes deposition testimony from AE employees about the events on the
night of the fire.  Zwirn states that the employees heard a fire alarm go off in the store 10 to 15
minutes before employees discovered the fire.  Zwirn Report at 8.  Because the alarm stopped and
no other announcement was made, the employees continued to work.  Id.  Brandon DeMoranville,
an AE employee, noticed the fire in the duct/marketing room and alerted other employees.  Id. at
9.  He testified that he left the first floor retail space to warn stock room employees in the
basement of the fire and then entered the building's lobby.  Id.  He approached the security desk
there and heard Haxhaj saying into the telephone, "It was a false alarm, I shut off the fire alarm."
Id.  DeMoranville testified that he stopped at the desk for several seconds and informed Haxhaj
that it was a real fire and that Haxhaj needed to call the police.  Id.  Haxhaj testified that he heard
no fire alarm that night until AE personnel informed him, and that he did not touch the master fire
alarm panel that night.  Id. at 8, 13.

According to Zwirn's report, before the fire, leaks and electrical shorts had occurred
throughout the building in various tenant spaces.  Id. at 9; Phillips Aff. ¶ 9.  During one of these
leaks six days before the fire, fire sensors had been triggered, causing the New York City Fire
Department ("FDNY") to respond.  Zwirn Report at 9; Phillips Aff. ¶ 9.  As a result, the building
manager, Peter Zanelli, and the building supervisor, Haim Quereti, repaired five sensors in the
same general location of the fire sensor on the second floor.  Phillips Aff. ¶ 9.  On the day of the
fire, an hour before it was discovered, Haxhaj was investigating a leak in the building.  Id. ¶ 10;
Zwirn Report at 10.

AE argues that Haxhaj turned off the fire alarm "with the obvious motive to prevent the situation of six days previously when water leaks shorted out fire alarm wiring automatically summoning FDNY to the building (with the clear potential for FDNY issuance of a fine to the building as a result of a repeat false alarm under the circumstances[.)]." Phillips Aff. ¶ 11.

AE asserts that the fire alarm system was programmed such that, in accordance with code requirements, the system would emit a "loud whooping sound" when smoke was detected. Id. ¶ 14. Strobe lights on the first and second floors would then activate for 30 seconds, halt for ten seconds, and then repeat. Id. The sequence would not stop until an "acknowledgment button" on the control panel was pressed. Id. Similar sequences of strobe light activation and loud tones would occur on other floors. Id. On the night of the fire, the first alarm that was actually transmitted from the building to AFA[1] and the FDNY was at 10:03 p.m. and occurred right after DeMoranville informed Haxhaj of the fire. Id. ¶ 15. AE asserts that for Haxhaj to have shut off the alarm, as DeMoranville overheard him say he did, not only would he have had to silence the alarm system, he also would have had to employ devices or methods at the fire command center panel "which effectively prevented the reporting of any alarm activations or trouble signals from being transmitted to the AFA Central Station while he was investigating the leaks in the building prior to the fire." Id.

Two days after the fire, before the Fire Marshals conducted their inspection, ISPI and 575 Broadway personnel went to the command station, scrolled back through the system's memory, and took pictures of all events on the panel readout which occurred at or after the alarm sounded.

---

[1] AFA Protective Systems, Inc. is the company that installed the alarm in the building, see Second Third-Party Complaint, filed July 17, 2009 (Docket # 62), ¶ 15, and served as the central station monitoring the building, Zwirn Report at 12.

Defendant/Second Third-Party Plaintiff AE Outfitters RetailCompany [sic] I/S/H/A American

Eagle Outfitters, Inc.'s Memorandum of Law in Opposition to Motions of Second Third Party

Defendant Integrated Systems and Power, Inc. And Third Party Defendants 575 Broadway, LLC,

575 Broadway Associates L.P., and 575 Broadway Corporation to Preclude the 2011 Inspection

of the Fire Alarm System at 575 Broadway And/Or Exclude American Eagle's Alarm Expert

Jeffrey Zwirn, filed Aug. 15, 2013 (Docket # 302) ("AE Mem."), at 8.[2]  Then they shut off power

to the fire alarm command unit.  Id.  Several hours later, when Fire Marshal Giampolo went to the

alarm command station in the lobby to check the system's memory, ISPI personnel informed him

that the unit had crashed and erased all events in its memory.  Id.

     Zwirn is an active Certified and Licensed Fire Alarm Contractor in the States of New

Jersey, New York, and Florida.  Zwirn Report at 16.  He has been appointed by the National Fire

Protection Association as a Principal Technical Committee Panel member and a designated

Special Expert in Fire Alarm Systems by the National Fire Alarm Code, NFPA 72, and by the

National Fire Alarm Signaling Code.  Id.  He is a Certified Fire Protection Specialist and a

National Institute for Certification in Engineering Technologies ("NICET") Level IV, Senior

Engineering Technician in Fire Protection Engineering Technology/Fire Alarm Systems.  Id.  He

serves as an instructor to the technical community of the fire alarm industry and a designated

expert instructor in Alarm Systems by the New York State Department of State, the New York

City Police Department, and State Fire Marshals of the FDNY.  Id. at 17.  He has served as an

instructor to the National Burglar and Fire Alarm Association and the Electronic Security

Association.  Id.  He has authored and created training curriculum for 38 state-certified

---

[2]  AE's memorandum does not include page numbers.  For ease of reference, the Court will refer to the page in AE's brief by means of the pages assigned by the ECF system.

continuing education courses.  Id.  He has also served as an expert witness in numerous cases in federal and state courts across the country.  See Deposition List (annexed as part of Ex. B to Phillips Aff.), at 1–9.

Zwirn visited the building twice.  Zwirn Report at 20.  In January 2006, Zwirn was hired to look at the fire alarm system at the scene of the fire, where he "photograph[ed] the general footprint of the building."  Deposition of Jeffrey D. Zwirn, dated May 29, 2012 (annexed as Ex. K to Mezzacappa Aff.) ("Zwirn Dep."), at 36.  The second visit to the building occurred in September 2011, when he conducted a more extensive inspection and performed tests on the fire alarm system.  Zwirn Report at 25.

B.      ISPI and 575 Broadway's Version of Events

The defendants have a different version of events, which we outline briefly for the sake of completeness.  They state that the fire began in the duct/marketing room, where AE stored combustible materials including "cardboard boxes, paper materials, clothing, a wooden/marketing desk, and poster boards," and that storage of these materials was in violation of applicable codes. Mezzacappa Aff. ¶ 11.  To light this room, AE used a temporary light bulb hanging from a duct shaft, also in violation of applicable codes.  Id. ¶ 12.  575 Broadway representatives had asked AE employees to clean out the marketing room, which AE continued to use for marketing materials. Id. ¶ 13.  On the night of the fire, the store closed to the public at 9 p.m. and employees remained in the store to do a "floor re-set."  Id. ¶ 14.  AE employees recalled a brief alarm at approximately 10:00 p.m.  Id.  At 10:02:54 p.m., the fire alarm system sent a signal to central station upon detection of the fire and at 10:07 p.m, firefighters arrived on the scene.  Id. ¶ 15.

ISPI's expert, Zygmunt Staszewski, P.E., asserts that no alarms were recorded by the system between 7:39 a.m. and 10:02 p.m.  See Letter from Zygmunt Staszewski, P.E., F.SFPE,

NICET III, to Michael P. Mezzacappa, Esquire, dated March 20, 2012 (annexed as Ex. M to Mezzacappa Aff.) ("Staszewski Report"), at 11.  He states that when activated, the alarm signal would have caused an alarm evacuation tone "slow whoop" on the second and third floor in accordance with the NYC Local Law and NYC Building Code in effect at the time.  Id.  Because AE had loud music playing in the store, the tone may have been masked by that noise.  Id. at 13. After the firefighters arrived, at 10:13:18 p.m., someone pressed the system acknowledgment button, silencing the alarms.  Id. at 15.  Staszewski states that it is likely that responding FDNY firefighters pressed this button in order to communicate more easily throughout the building.  Id. Staszewski's report states that no one would have been able to reset the system that night because the system cannot be reset while an initiating device, such as a smoke detector, is in alarm mode. Id. at 17.

On March 18, 1996, 575 Broadway received a Letter of Defect from the FDNY because the system did not have a "central station trip switch." Mezzacappa Aff. ¶ 16; Letter of Defect, dated Mar. 18, 1996 (annexed as Ex. I to Mezzacappa Aff.).  Simplex then installed such a switch and the FDNY issued a Letter of Approval.  Mezzacappa Aff. ¶ 16; Letter of Approval, dated Nov. 10, 1997 (annexed as Ex. J to Mezzacappa Aff.).  Since that time, the building has received no further violation notices or letters of defect for the alarm system or its component parts. Mezzacappa Aff. ¶ 16.

C.    Procedural History

On October 2, 2007, Atlantic Specialty Insurance Company filed the complaint in this action against AE for property damage, alleging that AE was negligent in its use of the duct room in the building.  First Compl.; Mezzacappa Aff. ¶ 4.  Two other insurance companies — Federal Insurance Company and Sompo Japan Insurance Company of America — also filed suit, and the

actions were consolidated.  See Consolidation Order, filed May 23, 2008 (Docket # 14).  AE

ultimately impleaded 575 Broadway and ISPI as third-party defendants.  See Defendant's Third-

Party Complaint, filed July 11, 2008 (Docket # 18); Second Third-Party Summons and Verified

Complaint, filed July 16, 2009 (Docket # 61).

     Following extensive discovery, AE made an application to allow Zwirn to conduct testing

of the fire alarm system at the building, which the Court granted.  See Order, dated July 14, 2011

(Docket # 206).  The Court's Order specifically noted that the ruling was "without prejudice to

any objections any party may have in the future as to relevance or admissibility of the proposed

testing or its results."  As noted, Zwirn conducted this inspection and testing in September 2011.

The defendants now move to preclude this inspection as well as Zwirn's report and testimony.[3]

---

[3]  Notice of Motion to Exclude, filed Nov. 15, 2012 (Docket # 249); Memorandum of Law in Support of Motion to Preclude the 2011 Inspection of the Fire Alarm System at 575 Broadway And/Or Exclude American Eagle's Alarm Expert, Jeffrey Zwirn, filed Nov. 15, 2012 (Docket # 251) ("ISPI Mem."); Mezzacappa Aff.; Notice of Motion of Defendant 575 Broadway Joining in Co-Defendant's Motion to Exclude, filed Nov. 15, 2012 (Docket # 260); Affidavit in Support, filed Nov. 15, 2012 (Docket # 261); Memorandum of Law in Support of Motion to Preclude the 2011 Inspection of the Fire Alarm System at 575 Broadway And/Or Exclude Alarm Expert, Jeffrey Zwirn, filed Nov. 15, 2012 (Docket # 262); AE Mem.; Phillips Aff.; Reply Memorandum of Law in Further Support of Motion to Preclude the 2011 Inspection of the Fire Alarm System at 575 Broadway And/Or Exclude American Eagle's Alarm Expert, Jeffrey Zwirn, filed Feb. 28, 2013 (Docket # 286) ("Def. Reply"); Reply Affidavit in Further Support of Motion to Exclude/Preclude, filed Feb. 28, 2013 (Docket # 287); Reply Memorandum of Law in Further Support of Motion to Preclude the 2011 Inspection of the Fire Alarm System at 575 Broadway And/Or Exclude Alarm Expert, Jeffrey Zwirn, filed Mar. 1, 2013 (Docket # 289).

II.     LAW GOVERNING ADMISSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule 702 standard incorporates the principles enunciated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 597 (1993), in which the Supreme Court held that trial courts have a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," and in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), in which the Supreme Court held that Daubert's general gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," id. at 141 (citing Fed. R. Evid. 702).

"One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 702); accord Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005); In re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 61, 68 (S.D.N.Y. 2001) ("As Rule 702's plain language shows, the opinion of an expert witness is only admissible if it (1) assists the trier of fact in (2) understanding the evidence or determining a disputed fact.") (emphasis in original). Additionally, as with all testimony, the expert's testimony must be relevant under Fed. R. Evid. 401, see, e.g., Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002), and may be excluded under Fed. R. Evid. 403 where its probative value is substantially outweighed by the danger of unfair prejudice and other

9

factors, see, e.g., Nimely, 414 F.3d at 397.

The  requirement that expert testimony assist the trier of fact is "akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence [,][but] . . . goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry."  Rezulin, 309 F. Supp. 2d at 540 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.03[1] (Joseph M. McLaughlin ed., 2d ed.1997)) (alterations in original).  "[T]he court is not obligated to accept a conclusion if it does not reliably flow from the facts available and methodologies used," Adel v. Greensprings of Vt., Inc., 363 F. Supp. 2d 683, 687 (D. Vt. 2005) (citing Amorgianos, 303 F.3d at 266), and "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony," Amorgianos, 303 F.3d at 266.  When presented with an expert opinion that is not sufficiently grounded in reliable facts, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

 Case law instructs the Court to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  Amorgianos, 303 F.3d at 267.

III.   DISCUSSION

In deciding whether to admit challenged expert testimony under Rule 702, a trial court may choose, but is not required, to hold an evidentiary hearing.  See Davis v. Carroll, 2013 WL 1285272, at *19 (S.D.N.Y. Mar. 29, 2013); accord Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) ("Whether to hold a Daubert hearing is within the discretion

of the court.") (citing Committee Note to 2000 Amendment to Rule 702); Colon ex rel. Molina v.

BIC USA, Inc., 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) ("Nothing in Daubert, or any other

Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing

before ruling on the admissibility of expert testimony.") (citing cases).  The law requires only that

the parties "have an opportunity to be heard before the district court makes its decision," Miller v

Baker Implement Co., 439 F.3d 407, 412 (8th Cir. 2006) (internal quotation marks and citation

omitted), and an evidentiary hearing "is unnecessary when the evidentiary record pertinent to the

expert opinions is already well-developed." Malletier, 525 F. Supp. 2d at 581.  Here, the parties

have provided extensive briefing on the issue of admissibility, the experts have been deposed, and

expert reports are before the Court.  A hearing would add nothing to the current record.

Accordingly, we conclude that an evidentiary hearing regarding the challenged testimony is

unnecessary.  See, e.g., United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007) (where

evidentiary record was fully developed, the "formality of a separate hearing was not required"),

cert. denied, 552 U.S. 1224 (2005); Malletier, 525 F. Supp. 2d at 582 (Daubert hearing

unnecessary where "the parties have extensively briefed the issues pertinent to each expert's

testimony.  Each of the challenged experts has been subject to a lengthy deposition.  Each of the

expert's reports (as well as each of the reports of experts challenging the reliability of some of

those reports) has been submitted to the court.").

Defendants seek to exclude "the inspection of the fire alarm system on September 17,

2011," ISPI Mem. at 8–11 (capitalization omitted), and, separately to exclude Zwirn's "report and

testimony," id. at 11–19.  They also argue that Zwirn cannot testify as an expert on the extent of

fire damage because he is not qualified in this area, ISPI Mem. at 19–21.

Rule 702 speaks to the admissibility of "testimony" and "opinion[s]."  Similarly, Rule 401

speaks to the exclusion of "evidence."  In the context of this motion, the "evidence" at issue

consists of the Zwirn's proposed testimony, inasmuch as AE was required to disclose in the

Report "all the opinions" Zwirn will "express" in his testimony.  See Fed. R. Civ. P.

26(a)(2)(B)(i).  As such, we do not see a warrant in the Federal Rules of Civil Procedure or in

case law to exclude, as defendants urge, the inspection itself as opposed to testimony that may be

based on that inspection.

 Accordingly, we turn to the aspect of defendants' motion that seeks to exclude the

proposed expert testimony of Zwirn as set forth in the Report.  In undertaking this consideration,

we of course will consider defendants' arguments regarding the relevance of the September 2011

inspection to the extent that the inspection forms the basis for any opinions in the Report.  Indeed,

the Daubert "requirement that the expert testify to scientific knowledge . . . means that any step

that renders the analysis unreliable under the Daubert factors renders the expert's testimony

inadmissible." Amorgianos, 303 F.3d at 267 (internal quotation marks and citation omitted).

 We begin by examining the Report itself to determine what opinions it contains that are

being offered as expert evidence.

 The first section of the Zwirn Report consists of a summary of deposition testimony and

other evidence gathered as part of the litigation process.  Zwirn Report at 1–15.  This summary

adds nothing to the record in the case and the Court assumes it has been presented as background

only.  Obviously, Zwirn would not be permitted to offer to a jury this narrative or any other

narrative that consists of his view of the facts of the case.  See, e.g., Highland Capital Mgmt., L.P.

v. Schneider,  379 F. Supp. 2d 461, 469 (S.D.N.Y.,2005) ("[A]n expert cannot be presented to the

jury solely for the purpose of constructing a factual narrative based upon record evidence").

 This factual portion of the Report is followed by a section entitled "Scientific and

Technical Methodology."  Zwirn Report at 16–23.  In fact, this section consists entirely of statements regarding Zwirn's qualifications and generic statements regarding fire alarm systems. Despite the title, there is nothing this portion of the Report that could be characterized as a description of the "methodology" used by Zwirn to arrive at the opinions expressed in the Report.

The next section of the Report is entitled "Conclusions."  Zwirn Report at 24–35.  It contains a description of the alleged failings that Zwirn identifies in the operation of the fire alarm system present in the building, which is referred to as the "Simplex 4100 Fire Alarm Control Unit."[4]

The main branch of defendants' motion is based on a single premise: that all of Zwirn's opinions regarding the operation of the fire alarm system in 2006 derive from the September 2011 inspection of a system that was not in place at the time of the fire.  ISPI Mem. at 8–11.  The opinions expressed in the Report that are material to this case are that three "instrumentalities of harm," as Zwirn puts it, existed in the fire alarm system at the time of the 2006 fire: (1)  a "central station activation switch" that allowed an individual to prevent any alarm signal from being transmitted to AFA; (2) a power shutoff switch, which allowed the fire alarm system to be shut down in its entirety; and (3) the absence of any connection between the "trouble output terminals" of the fire alarm control unit and AFA.  See Report at 25.   Each of these alleged "instrumentalities of harm" are discussed in the Report.  The ultimate conclusion of the Report is expressed in the following paragraph:

> [T]he only reasonable technical conclusion is that the system was intentionally disabled from functioning, by use of the "Central Station Activation Switch" being turned off, which in turn, mechanically and electronically disconnected the Central

---

[4]  The Report also contains a concluding section entitled "Spoliation," Zwirn Report at 35–38, which is discussed in section III.D below.

Station Transmitter from being able to detect an alarm condition from the Simplex 4100 Fire Alarm Control Unit Alarm Output terminals. Moreover, this had to have occurred by someone having access to the Fire Command Center at 575 Broadway and the switch.

Report at 35.

In light of defendants' argument that Zwirn's opinion as to these alleged flaws derives entirely from conclusions drawn from the September 2011 inspection, we next discuss the relationship between the 2011 inspection and the opinions expressed in the Zwirn Report.

> A.   The 2011 Inspection and the State of the Fire Alarm System in January 2006

Zwirn's conclusions as to the existence of the "three instrumentalities of harm" is based on the September 2011 testing.  Zwirn's discussion of the "central station activation switch" cites to his "testing at 575 Broadway," Zwirn Report at 26, and consists of a description of that switch that could only have been based on an inspection.  Similarly, the opinion regarding the existence and functioning of the "illegal power shutoff switch" is stated to have been discovered by Zwirn "during the inspection," Zwirn Report at 25, 28, as is the allegedly improper "trouble output" connection problem, id. at 31.

This motion would stand on a very different footing if Zwirn or AE laid a foundation reflecting that the system in September 2011 functioned in the same manner relevant to the conclusions Zwirn reached as it did on the night of the fire in January 2006.  However, neither Zwirn nor AE ever lays such a foundation.  Additionally, there is copious undisputed evidence that the original fire alarm system suffered extensive damage at the time of the 2006 fire.  Peter Zanelli, the building's manager, testified that two days after the fire, he observed the lobby and first floor of the building filled with water, which was "dripping everywhere, in between the walls, inside the electrical panels," and in particular "in the circuit boards and the CPU unit, in the

14

bottom of the splice boxes.  There was water everywhere."  <u>See</u> Deposition of Peter Zanelli, dated

June 29, 2010 (annexed as Ex. R to Mezzacappa Aff.) ("Zanelli 7/29 Tr."), at 507–09.  Zanelli

also testified that several circuit boards had to be replaced.  <u>Id.</u> at 510.

Thomas Ruggeri testified to the work that occurred on the system immediately following

the fire.  <u>See</u> Deposition of Thomas A. Ruggeri, dated June 1, 2010 (annexed as Ex. T to

Mezzacappa Aff.) ("Ruggeri Tr.").  He testified that "[n]one of the electronics [of the control

panel] remained, just the actual metal housing that houses each one of these switches."  <u>Id.</u> at 295.

He also stated at his deposition that "[s]ome of the wiring [used on and before January 2006] may

have still been reusable, but most of it, no."  <u>Id.</u> at 342.

In addition, ISPI's expert, Staszewski, searched the NYC Department of Buildings records

to find confirmation that six modifications of the fire alarm system were filed since the time of

the fire.  Staszewski Report at 8–10; ISPI Mem. at 8–9.  Likewise, the expert for Federal

Insurance Company, Richard Fedor, testified that there were several modifications to the system

between 2006 and 2011, and that an entire "pre-action system" had been removed after 2006.

<u>See</u> Deposition of the Plaintiff, Federal Insurance Company, et al., by a witness, Richard N.

Fedor, dated June 13, 2012 (annexed as Ex. P to Mezzacappa Aff.), at 314–16, 323–24.  575

Broadway's expert, Kenneth Garside, P.E., submitted a report in which he noted that "the subject

Class E fire alarm system was completely rebuilt and modified in various aspects as a result of

the subject 1/21/06 fire and for various reasons since the fire."  <u>See</u> Letter from Kenneth M.

Garside, P.E., CFEI, to Steven Capobianco, Esq., dated Mar. 29, 2012 (annexed as Ex. O to

Mezzacappa Aff.), at 6.

It is of course AE's burden to show by a "preponderance of proof" that Zwirn's testimony

satisfies Rule 702.  <u>Daubert</u>, 509 U.S. at 592 n.10 (citing <u>Bourjaily v. United States</u>, 483 U.S.

171, 175–76 (1987)); accord Soley v. Wasserman, 2013 WL 3185555, at *9 (S.D.N.Y. June 21,

2013) (burden to show the admissibility of expert testimony is on the proponent of the evidence).

And "[i]n order for an expert's opinion to be reliable and thus admissible, it must be grounded on

verifiable propositions of fact."  See Mink Mart, Inc. v. Reliance Ins. Co., 65 F. Supp. 2d 176,

180 (S.D.N.Y. 1999), aff'd, 12 F. App'x 23 (2000).  In this case, AE must prove that Zwirn can

offer reliable opinions about the operation of the fire alarm system — including the alleged

existence and operation of the central station activation switch and the power shutoff switch — in

January 2006 based on his inspection in September 2011.  Zwirn's Report and AE's briefing

address the issue but do not meet this burden.

Zwirn asserts that several circuit boards on the system existed at the time of the fire based

on the dates located on them, except for one board dated after the fire.  Zwirn Report at 36; AE

Mem. at 19–20.  He also opines that because the software on the panel in place in 2011 has an

issue date of 1998, the system remains the same as it was the night of the fire.  Zwirn Report at

36.  Zwirn asserts that ISPI employees have failed to explain which boards they removed or to

produce an invoice for replacement boards.  Id.; AE Mem. at 19.  But none of these statements

meet Zwirn's burden of showing that the switches he identifies as improper — or the allegedly

improper wiring of trouble point contacts — were present at the time of the fire.  Notably, in his

discussion of the central activation switch, Zwirn concedes that the switch had been rewired

between 2006 and 2011.  See Zwirn Report at 27 n. 26.

While AE argues that defendants have failed to show how the alleged modifications

affected the relevant parts of the fire alarm system, AE Mem. at 19–21, it is in fact AE's burden

to show that the system was the same in all respects relevant to Zwirn's opinions about it.  This

showing must be made against the background of uncontroverted evidence submitted by the

16

defendants of an array of damage, repairs and alterations to the system.  On this point, Zwirn makes reference to the fact that the software bears a 1998 "issue date" and that the "circuit boards" are "original" and bear "date codes" prior to the fire.  Zwirn Report at 36.  But there is no reliable evidence with respect to the date on which these particular circuit boards – regardless of their date code – were installed.  More importantly, there is no evidence or explanation as to how this shows that the operation of the system remained unchanged in light of the uncontroverted evidence of damage to the system as a direct result of the fire and the uncontested evidence that there has been rewiring.  Zwirn offers no evidence or explanation connecting his discussion of the dated circuit boards to the relevant aspects of the alarm system which he is asserting are unchanged.  In the end, Zwirn has failed to explain how the alarm system could operate in 2006 in the same manner it operated in 2011 after undergoing changes and sustaining damage during the intervening five years.

With respect to the "power cutoff switch," Zwirn states that during the September 2011 inspection it "appeared to be caked with dust and dirt such that it appeared to have been secreted in the housing for an extended period of time."  Report at 28.   But Zwirn does not specify the period of time he assumes the switch must have been in that location.  In any event, neither Zwirn nor AE provide any explanation for why this "dust and dirt" allows Zwirn to opine that the switch was present on the night of the fire in 2006, let alone that it was operating in the same manner.  Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'"  Rezulin, 309 F. Supp. 2d at 543 (quoting Daubert, 509 U.S. at 590).  Expert testimony that is "speculative or conjectural," therefore, is inadmissible. Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (citation omitted); accord Lippe v. Bairnco Corp., 288 B.R. 678, 686 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir.

17

2006).[5]

For these reasons, we cannot find that AE has met its burden of showing that Zwirn's testimony as to the system as it existed at the time of the fire is reliable in light of the fact that it is based on the properties of the fire alarm system as it existed in September 2011. Accordingly, the conclusions in the Zwirn Report as to the operation of the fire alarm system on the night of the fire must be excluded.

B.     Additional Defect as to Zwirn's Conclusion Regarding the Central Activation Switch

The Zwirn Report suffers from an additional and independent defect. As previously noted, the Zwirn Report concludes that the fire alarm system "was intentionally disabled from functioning, by use of the Central Station Activation Switch . . . which in turn mechanically and electronically disconnected the Central Station Transmitter from being able to detect an alarm condition from the . . . Control Unit alarm output terminals." Zwirn Report at 35. Even if we were to put aside the problem that AE did not show that the system had the same switch in 2006 or that such a switch operated in the same manner, this conclusion is unsupported for an entirely different reason.

Zwirn notes that during the September 2011 inspection, he observed that the central station activation switch "was not wired directly back to the external central station transmitter, as the code requires it to be." Zwirn Report at 26.[6] Zwirn uses this fact to conclude that "the actual

_____

[5] A separate problem with the opinion evidence regarding this switch is that it is uncontested that while the switch cut off electric power to the fire alarm unit, a backup battery still powered the unit. Staszewski Report at 21. Thus, the switch could not be used during the September 2011 inspection to stop the unit from operating.

[6] This is critical to his conclusion that Haxhaj must have manually shut off the alarm, thereby delaying the FDNY's response to the fire. Id.

18

purpose of the switch . . . is that it controlled the operation of the dialer from being able to

transmit a fire alarm signal to the AFA Remote Station unless it was manually turned to the 'On'

position." Zwirn Report at 27. But Zwirn never states that the switch operated in this manner

during the September 2011 testing. Instead, to support his opinion as to the "actual purpose" of

the switch, Zwirn relies on the testimony of an employee of the building, Security and Fire Safety

Director Larry McCarthy, and in particular the following colloquy:

> Q.   If the central station activation switch was in an off position, could a fire alarm go
>       out of the building to the Fire Department?
> A.   If it was in the off position?
> Q.   Yes.
> A.   No, you have to put it on to go through.

Zwirn Report at 27; see Examination Before Trial of the Defendant, 575 Broadway, LLC, by

Larry McCarthy, dated Mar. 12, 2009 (annexed as Ex. I1–I3 to Phillips Aff.) ("McCarthy Tr."), at

161. The problem with Zwirn's reliance on this testimony is twofold. First, it is incomplete.

McCarthy went on to answer that "[i]f there is an alarm in the system, it goes to [the central

station]. That is just a backup" when asked if a signal would go through when the switch is in the

off position. Id. He also testified immediately afterwards that the position of the switch would

not stop an alarm from transmitting to the Fire Department. Id. at 161–62.[7] Second, and more

fundamentally, Zwirn's expertise adds nothing to McCarthy's testimony. It requires no technical

acumen to discuss the functionality of the switch from the user's point of view. Thus, Zwirn

provides no useful opinion beyond his acceptance of McCarthy's initial testimony as to the

---

[7]   McCarthy testified again in June 2010 that flipping the switch up sends a manual signal
to the central station, that the switch is normally kept down, that the switch is tested monthly,
and that the switch has no "ability to stop an electronic alarm signal from transmitting to central
station . . . if a smoke detector went off." Deposition of Larry McCarthy, dated June 3, 2010
(annexed as Ex. W to Mezzacappa Aff.), at 29–34.

function of the switch in 2006.

Moreover, defendants have presented uncontroverted evidence that the current wiring of the activation switch is required pursuant to the New York City Code. Deposition of Peter Zanelli, dated June 10, 2010 (annexed as Ex. S to Mezzacappa Aff.) ("Zanelli 6/10 Tr."), at 48; Ruggeri Tr. at 283–86. Additionally, defendants have submitted uncontroverted evidence that the switch cannot be used to interfere with the system's signal to the central station. Zanelli testified that the switch did not interfere with the system's ability to send other signals or "with any other operation of the fire alarm panel." Zanelli 6/10 Tr. at 25. Zanelli also testified that generally no switch exists in the building which cuts off the ability to send a message to the central station. Id. at 48. Staszewski states without contradiction that he observed Zwirn activate the switch at the September 2011 testing, and that it "worked as it is supposed to do, activating Zone 1 on the Central Station Transmitter and sending a CLASS E alarm to the AFA Central Station" and that "the fire alarm system was tested by Mr. Zwirn with the switch in both positions, and it was verified that the switch had no effect on the fire alarm system operation." Staszewski Report at 20 (emphasis in original). Likewise, Ruggeri testified that the switch was "[t]otally independent of the alarm function." Ruggeri Tr. at 278.

Thus, there is no evidence beyond Zwirn's own speculation to support his opinion that the switch was capable of preventing the transmission of the alarm. Indeed, in light of the apparent failure of the switch to perform at the September 2011 testing in accordance with his opinion, Zwirn is reduced to noting that the switch was rewired between 2006 and 2011. See Zwirn Report at 27 n.26. But AE has failed to show any evidence to support the theory that it was rewired to change the switch's operation from the way Zwirn speculates it operated. The extent of speculation required for Zwirn's theory to be supported is reflected in AE's reference to the

20

fact that there would be "no great mystery or complexity in the rewiring of the subject switch to act as a silent cut off switch in the manner indicated by Mr. Zwirn." AE Mem. at 27. That defendants hypothetically could have rewired the central station activation switch, however, provides no support whatsoever for Zwirn's conclusion that the switch actually operated in 2006 in the manner he asserts.

As noted, Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" Rezulin, 309 F. Supp. 2d at 543 (quoting Daubert, 509 U.S. at 590); accord Dora Homes, Inc. v. Epperson, 344 F. Supp. 2d 875, 889 (E.D.N.Y. 2004) (finding expert's testimony inadmissible where it was based wholly on speculation). Because Zwirn's opinion as to the functioning of the central station activation switch at the time of the fire is entirely speculative, it is not admissible.

*   *   *

We conclude our discussion by addressing AE's contention that multiple witnesses testified that an alarm went off that then stopped, that this alarm was followed some minutes later by a steady alarm, and that Haxhaj's allegedly admitted that he shut off the alarm. AE Mem. at 14-16. AE argues that, in light of this evidence, Zwirn's testimony is "relevant" to the issue of how the fire alarm system could have been configured to enable Haxhaj to temporarily shut off the alarm. Id. at 14. The Court's ruling, however, disposes of the defendants' motion based on whether Zwirn's proposed testimony is reliable not based on whether it is relevant to an issue in this case. Thus, the instant ruling should not be construed as suggesting that testimony as to the alleged alarm shutoff is not relevant or admissible. We conclude only that Zwirn has not been able to provide reliable opinion evidence as to the specific means by which such an alarm shutoff could have occurred at the time of the fire

C.    Preclusion as to Extent of Fire Damage

Finally, defendants' separate application to preclude Zwirn as an expert on the extent of fire damage is granted.  The testimony at issue is Zwirn's statement in the report that had the Fire Department been "notified immediately upon detection of the Fire and/or Smoke condition occurring at the subject building," such notification would have "significantly minimiz[ed] the damages sustained to the premises."  Zwirn Report at 37.  Zwirn does not profess to have any expertise in issues regarding fire damage.  Moreover, the mere fact that a fire causes increasing damage the longer it burns is an obvious statement, and a lay person is entirely capable of reaching this conclusion without the help of an expert.  See, e.g., Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989) (expert testimony is inadmissible when it addresses "lay matters which a jury is capable of understanding and deciding without the expert's help") (citing cases).  Accordingly, Zwirn's opinion on the extent of fire damage resulting from the response time of the Fire Department is inadmissible.

D.    Spoliation Allegations

AE makes allegations of spoliation with respect to the condition of the system, AE Mem. at 17–19, 22; Zwirn Report at 35–37.  The allegations cannot possibly provide the necessary support to draw conclusions about the 2006 system based on the 2011 inspection or to otherwise bolster Zwirn's testimony.  To the extent that AE is seeking to admit Zwirn's testimony to prove that spoliation of evidence occurred, see AE Mem. at 18, there is no motion for sanctions for spoliation pending.  And nothing in AE's allegations regarding the defendants' conduct during the course of discovery alters the fact that Zwirn has not provided a reliable methodology supporting his opinions. Thus, the Court does not address this issue further.

22

IV.     CONCLUSION

     For the foregoing reasons, defendants' motion to preclude the opinions and conclusions in the Zwirn Report (Docket ## 249, 260) is granted.

SO ORDERED.

Dated: September 20, 2013
     New York, New York

                                        GABRIEL W. GORENSTEIN
                                        United States Magistrate Judge